S. AMANDA MARSHALL, OSB #953473
United States Attorney
District of Oregon
BYRON CHATFIELD, OSB #730599
Assistant United States Attorney
Email: byron.chatfield@usdoj.gov
310 West 6th Street
Medford, OR  97501
Telephone:  (541) 776-3564
Facsimile:   (541) 776-3583
Attorneys for United States of America

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                Plaintiff,<br>    v.<br><br>STEVEN METHENY,<br><br>                Defendant. | 1:13-CR-00053-PA<br><br>GOVERNMENT'S MEMORANDUM REGARDING TRIAL DATE CONTINUANCE |

The Government's memorandum is submitted pursuant to the Court's order for supplemental briefing for an explanation of the main issues to be litigated at trial in order to assist the Court in determining defendant's request to continue the trial date and for what length of time.  The issues to be litigated and the scope of evidence addressing those issues at trial surround three central areas: 1) the defrauding of the United States Forest Service (FS) in procuring FS contracts (Counts 1-13)[1]; 2) the dissemination of false information that endangered the safety of helicopters in flight (Counts 14-22)[2]; and, 3) the theft from an interstate shipment (Count 23)[3].

---

[1] Conspiracy to Defraud the Forest Service, 18 USC §§1341 and 1343; Mail and Wire Fraud, 18 USC §1341; and False Statements, 18 USC §1001.
[2] 18 USC §32(a)(7).
[3] 18 USC §659

**OVERVIEW OF THE CHARGES**

In 2008, the FS solicited bids for helicopter services for firefighting operations. As part of a scheme to defraud the FS, defendant Steve Metheny (Metheny), aided by codefendant Levi Phillips (Phillips)[4], submitted contract bid proposals on behalf of Carson Helicopters (Carson) to the FS with falsified helicopter weight and balance charts and falsely altered helicopter performance charts to be used in determining whether the helicopters met minimum contract specifications and the awarding of contracts. As a result of these fraudulent misrepresentations, the FS awarded contracts to Carson and it received over $20,000,000.

Further, Metheny distributed, personally and through others unwittingly, the falsified helicopter weight and balance charts, as well as other falsely altered helicopter performance charts to pilots and helicopter flight manuals for use in the field. Unaware of the false nature of the charts, the falsified charts were then used by pilots and others, in performing wildfire flight operations including their use in calculating the helicopter's maximum payload capacity during firefighting operations thereby endangering the safety of those helicopters in flight.

Lastly, Metheny committed theft of three Carson helicopter tail rotor blades from a flatbed trailer that was part of an interstate shipment of freight destined for Carson's facility in Pennsylvania.

---

[4] Phillips has pled guilty for his participation in the Conspiracy to Defraud the Forest Service and is pending sentencing.

**Forest Service Contract Fraud**

The FS solicited bids involving four separate contracts. In order to qualify for consideration, the contracts required that helicopters meet certain minimum performance specifications. In evaluating whether those specifications were met, each contract required the actual weighing of every helicopter prior to the bid proposal and within a prior 24 month period, as well as calculating each helicopters payload capability using the appropriate Federal Aviation Administration (FAA) approved performance charts based on minimum engine specification performance. Contractors were prohibited from submitting bids using an estimated empty weight of the helicopter or any FAA helicopter performance enhancing chart in calculating its payload capability in meeting the FS minimum performance specifications. Any bid proposal that failed to meet those requirements was rejected from contract consideration.

The government's evidence will center on Metheny's active participation in the fraudulent scheme by knowingly creating and submitting the falsified documents to the FS, distributing falsified documents to the helicopters for FS contractual compliance inspections and attempting to conceal the fraud by obstructing the FS and the National Transportation Safety Board (NTSB) from finding out the actual weight of the crash helicopter, as well as the FS efforts to determine whether the remaining helicopters were at actual bid weights for contractual compliance.

The evidence will include testimony about some of the following: Metheny having sole responsibility for bidding on FS contracts and knowing that certain helicopters were not actually weighed as required; Metheny having Phillips create a formula that Metheny then used in calculating a desired empty helicopter weight and balance chart (Chart B) for eight of the

3 – GOVERNMENT'S MEMORANDUM REGARDING TRIAL DATE CONTINUANCE

helicopters in the bid proposals as well as making further adjustments to the Chart B's to further deceive the FS; Metheny's misrepresentation on a Chart B that he had witnessed the actual weighing of a helicopter in the bid proposal when it was in fact located in another country and was never weighed; Metheny knowingly misleading the FS when questioned about the significant payload capability of the helicopters in his bid proposals compared to other operator proposals; a forensic examination of Carson computers linking Metheny to falsified Chart B's submitted in the bid proposals; Metheny submitting an FAA performance chart used in calculating each helicopter's maximum payload capacity in the bid proposals knowing that it was falsely altered to be a performance enhancing chart; FS field personnel relying on the falsified chart information during contract compliance inspections and flight operations; the FS discovering through an eventual weighing of the helicopters that they were all over both the contract bid proposal weight and their current represented operational weight despite efforts to conceal this information; and, the discovery that the actual weight of the crash helicopter was over the contract bid proposal weight as well as its represented operational weight and efforts to conceal it.

     In short, each contract bid proposal submitted by Metheny to the FS had falsified helicopter empty weight and balance Chart B's rather than Chart B's from an actual weighing of each helicopter.  Likewise, each contract bid proposal had falsely altered official FAA helicopter performance charts that were deceptively altered ("cut and paste") into contractually prohibited performance enhancing charts.  These charts were then used in calculating each helicopter's payload capability to meet FS minimum performance specifications.  Based on these misrepresentations, the FS not only awarded contracts to those helicopters but at a higher, and

more profitable, contract tier-level. Subsequent efforts were then made to conceal these misrepresentations. Consequently, the government anticipates trial issues will involve Metheny's knowledge of the falsified charts, his participation in the fraudulent scheme and his attempts to conceal it.

**Endangering the Safety of the Helicopters**

Besides having the falsified helicopter weight and balance documents distributed to various helicopters, the government's evidence will also involve Metheny knowingly causing the distribution of two other falsely altered FAA helicopter performance charts (cut and paste) to pilots and helicopter flight manuals for use in the field. These performance charts, altered to be performance enhancing charts, were different from what Metheny submitted earlier in his contract bid proposals. This false information was then used by pilots and others in performing wildfire flight operations. Unaware of the false nature of the charts, pilots used them in calculating the helicopter's maximum payload capacity during firefighting operations including transporting firefighting personnel thereby endangering the safety of the helicopters in flight.

On August 5, 2008, helicopter N612AZ crashed in California while transporting firefighters. Based on evidence from an actual weighing of N612AZ in early 2008, the helicopter was over both the contract bid proposal weight submitted to the FS and the current helicopter weight chart by more than 1,400 lbs. Besides unknowingly using a falsified helicopter weight for the flight, Carson pilots also used one of the falsely altered performance charts Metheny caused to be distributed to them. Moreover, the FS helicopter manager responsible for the flight operation was deceived into unknowingly approving the operation based on the use of

the falsified helicopter weight information, the falsely altered FAA performance chart and an inaccurate allowable payload of the helicopter for safe operation.

There has been considerable dispute about the actual cause of the N612AZ crash. NTSB determined that the cause of the crash was related to an understatement of the helicopter's empty weight, the use of the altered power performance chart and pilot calculations that resulted in them overestimating the payload capacity of the helicopter. On the other hand, a jury in a state civil lawsuit involving the crash reached a verdict for plaintiffs apparently attributing the major cause of the crash to a defect in the fuel filtration system of a fuel control unit that was insufficient to prevent contaminants from reaching and degrading one of the engines and causing its failure.

Importantly, it is unnecessary to determine the actual cause of the N612AZ crash in this case. In other words, the government does not contend that the falsified helicopter weight and balance documents and the falsely altered FAA helicopter performance chart were the actual cause of the crash. Rather, under the circumstances in which the falsified information would reasonably be believed and was used in flight operations, including using it in calculating changes in the helicopter's weight and determining its maximum payload capacity, it endangered the safety of the helicopter in flight whether it crashed or not. It was the use of this falsified information from Metheny that created an increased danger to the aircraft in flight during wildfire operations beyond the danger inherent in such flights. Nothing more is required for a violation under 18 USC §32(a)(7). *United States v. Mendoza*, 244 F.3d 1037 (9th Cir. 2001). Consequently, the government anticipates trial issues on these charges will revolve around Metheny's knowledge of the false information and distribution of it, and whether the use of that

6 – GOVERNMENT'S MEMORANDUM REGARDING TRIAL DATE CONTINUANCE

falsified information endangered the safety of the various helicopters while conducting flight operations under the contracts.

**Theft from Interstate Shipment**

Carson leased a flatbed trailer for the purpose of transporting helicopter parts and equipment from Grants Pass, Oregon to its facility in Perkasie, Pennsylvania. Among the items that were loaded and secured for transport were helicopter tail rotor blades. Three tail rotor blades were then stolen from the shipment. Shortly thereafter, Carson began investigating allegations that Metheny was personally selling Carson property and depositing the funds into an account for his own private company. Carson suspended Metheny for various reasons. Several months after the tail rotor blade theft and three weeks following his suspension, Metheny attempted to surreptitiously return the tail rotor blades to Carson by means of a local delivery service. Through Metheny's representations to the delivery service and invoice documentation, he attempted to shift responsibility onto a former Carson employee. The government anticipates the central issue on this charge will be whether Metheny committed the theft of the tail rotor blades.

## DISCOVERY

The government has provided discovery to the defense including areas of investigation not directly related to the issues and charges in this case. In doing so, the government has gathered information from various sources such as NTSB and it is available to the defense in one location. Pursuant to the Court's earlier direction, the government identified those areas of the discovery considered most relevant in this case. An index was also provided in discovery although it is of most use in locating specific witness interviews and depositions including those

of potential expert witnesses. In addition, discovery was placed on CD's with the US Attorney's Automated Legal Support section putting it in two different searchable formats: PDF and Concordance or Summation database programs.

The government also delivered a list of 34 potential expert witnesses who will provide at least some testimony as expert witnesses. The reason for the larger number is because the vast majority of them are pilots and mechanics of the aircraft in question that have experience in helicopters and the use of the various types of charts that are in issue in the case. Certain portions of their testimony will obviously relate to those charts. Also, the list includes three other witnesses that the government anticipates will testify exclusively as experts from the following federal agencies: FAA, Department of Interior and Department of Transportation.

## CONCLUSION

Although there is a considerable amount of discovery, the areas of relevant material have been narrowed and identified as well as having the discovery setup in a searchable format. Based on the identifiable issues to be litigated in the case, defense's requested continuance certainly should be no longer than 90 days or so.

Respectfully submitted this 6th day of August, 2014.

S. AMANDA MARSHALL
United States Attorney

\s\ *Byron Chatfield*
BYRON CHATFIELD
Assistant United States Attorney