S. AMANDA MARSHALL, OSB# 953473
United States Attorney
District of Oregon
**BYRON CHATFIELD, OSB# 730599**
Assistant United States Attorney
byron.chatfield@usdoj.gov
310 West Sixth Street
Medford, Oregon  97501
Telephone:    (541) 776-3564
Facsimile:    (541) 776-3583
Attorneys for the United States of America

## UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | **1:13-CR-00053-PA** |
| **Plaintiff,** | **GOVERNMENT'S** |
| **v.** | **SENTENCING MEMORANDUM** |
| **STEVEN METHENY,** | |
| **Defendant.** | |

The United States of America (hereinafter the government), by and through its attorneys,

S. Amanda Marshall, United States Attorney for the District of Oregon, and Byron Chatfield,

Assistant United States Attorney, hereby submits the following sentencing memorandum in this

case.

## TABLE OF CONTENTS

INTRODUCTION ............................................................................................................1

CRIMINAL OFFENSE AND RELEVANT CONDUCT ..............................................1

  A.  OVERVIEW ........................................................................................................1

  B.  FOREST SERVICE NATIONAL EXCLUSIVE USE AND CALL-WHEN NEEDED
      CONTRACTS.........................................................................................................2

      1.  Contract Requirements.................................................................................3

  C.  CONTRACT BID PROPOSALS AND AWARDING OF CONTRACTS........................3

      1.  Metheny's Position and Authority ...............................................................3

      2.  Phillips Position ...........................................................................................4

      3.  Contract Proposals .......................................................................................4

          a.  Helicopter Weighing.............................................................................4

              i.      Phillips Listed as the Chart B Preparer .......................................6

              ii.     Metheny Listed as the Chart B Preparer .....................................6

          b.  Helicopter Power Available Charts .......................................................7

          c.  Assembling the Contract Bid Proposals ................................................8

          d.  Evaluation of Carson's Bid Proposals ...................................................9

          e.  Contracts Awarded.................................................................................10

  D.  FALSIFIED DOCUMENTS PLACED IN HELICOPTER FLIGHT MANUALS ..........11

  E.  DIFFERENT FALSIFIED PERFORMANCE CHARTS DISTRIBUTED TO PILOTS..12

  F.  UTILIZING FALSIFIED POWER AVAILABLE CHARTS FOR PASSENGER
      FLIGHTS ..............................................................................................................13

  G.  N612AZ HELICOPTER CRASH............................................................................14

      1.  Falsified Weight and Balance Documents ...................................................15

i

2. Distribution of Falsified Power Available Performance Chart....................................16

3. August 5, 2008 Crash..................................................................................................17

H. CONCEALING INFORMATION...........................................................................20

1. Falsified Weight and Balance Documents................................................................20

2. Falsified Power Available Chart...............................................................................22

I. FOREST SERVICE WEIGHING OF HELICOPTERS...........................................24

1. Concealing the Fraud...............................................................................................24

2. Helicopter Weighing................................................................................................25

J. TERMINATION OF THE CONTRACTS..............................................................26

GUIDELINE CALCULATION...........................................................................................26

SECTION 2B1.1 LOSS CALCULATION...........................................................................27

A. ACTUAL OR INTENDED LOSS..........................................................................27

B. CREDIT AGAINST LOSS.....................................................................................30

SECTION 2B1.1 RISK OF SERIOUS BODILY INJURY.................................................32

OTHER OFFENSE CONDUCT AND MISAPPROPRIATION OF ASSETS.....................35

A. MISUSE OF CARSON CREDIT CARD...............................................................36

B. RENOVATIONS AT METHENY'S RESIDENCE.................................................36

C. TRANSFER OF FUEL............................................................................................36

D. UNAUTHORIZED PURCHASE/MISAPPROPRIATION OF HELICOPTERS
PARTS....................................................................................................................36

E. THEFT OF HELICOPTER TAIL ROTOR BLADES............................................38

SENTENCING RECOMMENDATION..............................................................................39

## INTRODUCTION

On November 25, 2014, Steven Metheny (Metheny) pled guilty to the following counts of the Indictment: Count 1—Conspiracy to Commit Mail and Wire Fraud in violation of 18 U.S.C. §§ 1341, 1343 and 1349; Count 8—Making a False Statement in violation of 18 U.S.C. § 1001.  These offenses occurred between March 2008 and October 2008.

Sentencing in this case is currently set for Monday, April 6, 2015, at 10:00 a.m. in the United States Courthouse in Medford, Oregon.  The Attachments to the government's sentencing memorandum have exhibits.  Some of those exhibits are being submitted to the Court under seal. The exhibits submitted under seal are identified in the index to each Attachment.

The government is recommending that this Court sentence Metheny to **188 months'** imprisonment and a three year term of supervised release.

## CRIMINAL OFFENSE AND RELEVANT CONDUCT

### A.    OVERVIEW

In 2008, the United States Forest Service (FS) solicited bids for helicopter services for firefighting operations.  As part of a scheme to defraud the FS, defendant Steven Metheny (Metheny), aided by defendant Levi Phillips (Phillips), submitted contract bid proposals on behalf of Carson Helicopters (Carson) to the FS with falsified helicopter weight and balance charts and falsely altered helicopter performance charts to be used by the FS in determining whether Carson's helicopters met minimum contract specifications and the awarding of lucrative FS contracts.  As a result of these fraudulent misrepresentations, the FS awarded contracts to Carson including option years amounting to over $51,000,000.  Carson received $18,831,891.12

GOVERNMENT'S SENTENCING MEMORANDUM                                    PAGE 1

prior to the FS cancelling the contracts.

Further, Metheny distributed, personally and through others unwittingly, the falsified helicopter weight and balance charts, as well as other falsely altered helicopter performance charts to pilots and helicopter flight manuals for use in the field. Unaware of the false nature of the charts, the falsified charts were then used by pilots and others in performing wildfire flight operations including their use in calculating the helicopter's maximum payload capacity during firefighting operations thereby risking the life and safety of those operating the helicopters and those aboard, including firefighters.

Following the crash of N612AZ, Metheny and Phillips schemed and engaged in various conduct to conceal the fraud from the FS. Moreover, Metheny concealed the fraudulent conduct involving N612AZ from the National Transportation Safety Board (NTSB) during its crash investigation and actually obstructed the investigation itself.

## B.    FOREST SERVICE NATIONAL EXCLUSIVE USE AND CALL-WHEN-NEEDED CONTRACTS

The FS solicited bids involving four separate contracts. The solicitations for bids included the Large Fire Support Exclusive Use Contract (LFS Contract), the Initial Attack Exclusive Use Contract (IA Contract), the Interim Call-When-Needed Contract (CWN #1 Contract) and the Call-When-Needed Contract (CWN #2 Contract).

In Exclusive Use contracts, the contractor receives a daily availability rate over a set period of days, regardless of whether or not the helicopter is used, and an additional hourly rate while the helicopter is in flight. The LFS Contract generally refers to helicopters used for water dropping or other jettisonable loads, while IA Contract helicopters are intended primarily for

GOVERNMENT'S SENTENCING MEMORANDUM                                    PAGE 2

carrying passengers i.e. firefighters.  (PSR ¶17).  The Call-When-Needed contracts were for helicopter services on an "as needed basis" with a set daily availability rate and hourly amount when actually used.  (Attachment #1 p2).  The solicitation was for the 2008 base year with additional option years.  (Attachment #1 p6-8; PSR ¶17).

### 1.  Contract Requirements

To qualify for consideration, the contracts required that helicopters meet certain minimum performance specifications.  In evaluating whether those specifications were met each contract required the actual weighing of each helicopter prior to the bid proposal and within a prior 24 month period, as well as calculating each helicopter's payload capability using only the appropriate Federal Aviation Administration (FAA) approved performance charts based on minimum engine specification performance.  Contractors were prohibited from submitting bids using an estimated empty weight of the helicopter or any FAA helicopter performance enhancing chart in calculating its payload capability to meet the FS minimum performance specifications because they were crucial to making such determination and for ultimate flight safety.  (Attachment #1 p3-5; PSR ¶20).  Any bid proposal that failed to meet these requirements was rejected outright from contract consideration.  (Attachment #1 p11-12).

## C.    CONTRACT BID PROPOSALS AND AWARDING OF CONTRACTS

### 1.  Metheny's Position and Authority

Metheny was Vice President and Director of Field Operations for Carson at its West Coast office in Grants Pass, Oregon.  Metheny was responsible for managing the facilities, operations, and staff of Carson in Grants Pass.  He had the power to hire and fire employees

GOVERNMENT'S SENTENCING MEMORANDUM                                    PAGE 3

along with determining their salaries. (Attachment #1 p1-2). He also had total authority and responsibility for bidding on the FS helicopter contracts for Carson including the contents of any items in the bid proposal packages. (Attachment #1 p2). Metheny received a salary of $170,000 plus any bonuses. The bonuses were based upon the amount of money the company earned at the conclusion of the fire season. At the conclusion of the 2007 fire season, Metheny received a $100,000 bonus. (Attachment #1 p2; PSR ¶12).

### 2. **Phillips Position**

Phillips was the Director of Maintenance for Carson at its facility in Grants Pass, Oregon. (PSR ¶12).

### 3. **Contract Proposals**

Metheny was directly and actively involved in every segment of each contract proposal submitted to the FS. Each proposal was submitted by FedEx to the FS at the National Interagency Fire Center in Boise, Idaho, knowing that the information was false and contained misrepresentations including the weight and balance, performance power available and allowable payload of the helicopters. (PSR ¶¶13, 35).

### a. **Helicopter Weighing**

The weight and balance (W&B) documents for a Sikorsky S-61N helicopter consist of three interrelated charts known as Chart B (Actual Aircraft Weight and Horizontal Balance), Chart A (Empty Weight Checklist), and Chart C (Base Weight and Balance Record). The Chart

B is used to record results of an actual weighing of a helicopter.[1]  The Chart A is used to denote

exactly how an aircraft is equipped at the time of weighing, and the Chart C is used to record

changes to the helicopter's weight as the result of subsequent equipment changes made to the

aircraft.  The Chart C is basically a running ledger of a helicopter's weight between each

weighing.  It is the document from which pilots obtain the current aircraft weight for load

calculations.  (Attachment #2 p2; PSR ¶22).

    When W&B documents for the helicopters were being gathered for the bid proposals,

Metheny learned from the Supervisory Mechanic in Perkasie that N410GH and N905AL had not

been weighed because they were disassembled at Carson's Perkasie, Pennsylvania facility and

they could not be weighed in time for submission of the LFS Contract bid.  Metheny and Phillips

discussed ways to determine the Chart B empty weight of both helicopters for the bid proposals,

knowing it was a direct violation of a contract requirement.  (Attachment #2 p5; PSR ¶24).

    Phillips then created a formula using Microsoft Excel designed to allow Metheny to enter

a desired weight along with a desired center of gravity which would then generate the necessary

scale readings needed to complete the Chart B in order to make it appear that the helicopter had

actually been weighed.  When Metheny noticed the formula always produced the same figures

for the left and right main scale readings, Phillips adjusted the formula thereby further

concealing that the readings were fabricated and deceiving the FS into believing the chart was

---

[1] Three individual scale readings are taken: left main, right main, and nose/tail.  They are added
together to obtain the helicopter's total weight.  The total weight and nose/tail reading are used to
determine the aircraft's center of gravity (COG).  The data from the weighing (e.g., date of
weighing, individual scale readings, total weight, COG, moment) is entered on the Chart B.
(Attachment #2 p2).

GOVERNMENT'S SENTENCING MEMORANDUM                                    PAGE 5

from an actual weighing of the helicopter, as required.  (Attachment #2 p6; PSR ¶24).  On April 2, 2008, Phillips emailed the formula to Metheny to use.  (Attachment #4 p2; PSR ¶24).

### i.    **Phillips Listed as the Chart B Preparer**

Unbeknownst to Phillips at the time, Metheny used the formula to complete the bogus Chart B empty weight and balance for not only N410GH and N905AL, but for six other helicopters Metheny submitted in the bid proposals: N612AZ, N116AZ, N4503E, N612RM, N61NH and N7011M.  (Attachment #2 p6).  Metheny provided handwritten versions of these Chart B's to Tami Hutchison (Hutchison), Assistant Director of Operations, to type for inclusion in Carson's bid proposals.  Because the handwritten versions did not contain a name in the "Prepared by" column, Metheny told her to use Phillips name, implying that it was appropriate because Phillips was the Director of Maintenance.  (Attachment #2 p6).  However, Phillips did not prepare the Chart B's and the helicopters were not weighed on the various different dates listed on the charts or weighed as represented.  In addition, when these Chart B's with Phillip's name typed in the "prepared by" column were submitted with the CWN #2 Contract proposal, they were signed by Metheny falsely representing he witnessed the actual weighing of each helicopter.  (Attachment #2).

Moreover, not only was N7011M not weighed, but the weighing date listed on the Chart B was during a time the helicopter was either in Australia or in transport back to the United States on a container ship.  (Attachment #2 p8-9).

### ii.    **Metheny Listed as the Chart B Preparer**

Metheny was listed as having prepared the Chart B weighing for N103WF.  He also

GOVERNMENT'S SENTENCING MEMORANDUM                                      PAGE 6

signed it, representing that he had witnessed the weighing. However, the helicopter was in Canada at the time of the alleged weighing and no weighing ever took place while it was there. (Attachment #2 p3). Although Hutchison typed the falsified Chart B's for the other eight helicopters at Metheny's direction, Metheny prepared the Chart B for N103WF. (Attachment #2 p5).

In addition, all of W&B documents Metheny submitted to the FS for these helicopters were fraudulent and underreported what the aircraft weighed as equipped for the FS contracts. (Attachment #2 p3, 7, 8, 10, 11, 12, 13).

### b.  Helicopter Power Available Charts

Each contract bid proposal submitted to the FS included copies of various FAA performance charts to be used in conjunction with the helicopter's weight and balance in calculating the payload capability of each helicopter.

In 2006, after discovering several Sikorsky S-61 operators were using the OEI (One Engine Inoperable) 2½ Minute Power Available chart for contract bidding, and consulting with Sikorsky, FAA and the engine manufacturers, the FS issued a letter to Metheny informing him that it had determined that the use of OEI 2½ Minute performance charts were intended for emergency or one engine inoperative operations only; by allowing Sikorsky S-61 helicopters to use this enhanced performance data to better the helicopters' performance for bidding or dispatch purposes not only compromises safety, but gives them an unfair advantage over others in contracting with the FS. The FS specifically instructed Metheny that it was prohibiting the use of these charts for contract bidding or helicopter load calculations in the field. Metheny was

GOVERNMENT'S SENTENCING MEMORANDUM                                    PAGE 7

upset over this decision.  (Attachment #3 p2-3).

Despite the FS written directive, Metheny included in the performance charts for RFMS

#6 a falsely altered FAA chart labeled "RFMS #5" in each bid proposal.[2]  Rather than having a

5-Minute Takeoff Power Available chart as represented, it contained a pictorial graph from a

performance enhancing, OEI (One Engine Inoperable) 2½ Minute Power Available chart.

(Attachment #3 p6-11).

Shortly before the LFS bid proposal was due, Carson Chief Pilot John Harris (Harris)

observed RFMS #8 and #9 lying on Metheny's desk that related to the installation of a rescue

hoist on the helicopters.  He took and photocopied them.[3]  Within those documents, he

discovered the suspicious 5 Minute Power Available chart labeled "RFMS #5," instead of it

being correctly labeled as RFMS #6.  Harris brought the discrepancy to Metheny's attention, but

was told not to be concerned, Metheny would figure it out.  (Attachment #3 p13).

### c.   Assembling the Contract Bid Proposals

Hutchison assisted with compiling various documents for the contract bid proposals in

2008.  Metheny instructed her in which charts and supplements were required and he provided

her with the aircraft weights and performance figures for her to prepare the FS load calculation

---

[2] The FAA issues Supplemental Type Certificates (STC) to rotorcraft operators whenever FAA
approves an aircraft modification.  Carson obtained various STC's for their modifications to
Sikorsky S-61 helicopters including supplement modifications that were labeled Rotor Flight
Manual Supplement (RFMS) #5 through RFMS #9.  (Attachment #3 p2-3).

[3] Harris would later discover that the RFMS #8 and #9 he copied was also a falsified 5 Minute
Power Available chart which actually contained the OEI 2½ Minute Power Available pictorial
graph.  (Attachment #3 p12).

GOVERNMENT'S SENTENCING MEMORANDUM                              PAGE 8

form for the contract proposals.  At the time, Carson was only bidding on the lower LFS

Contract Tier 3 items.  (Attachment #3 p4).  Hutchison provided the completed LFS Contract bid

proposal package to Metheny the day before it was to be shipped to the FS.  However, the

following morning Metheny instructed Hutchison to prepare a new proposal, claiming he had

found out he could use their new performance charts and they could now meet the higher Tier 2

contract specifications.  Hutchison did as she was instructed, using the new information Metheny

provided to her.  (Attachment #3 p4-5).

Metheny claimed in the bid proposals that Carson had improved takeoff power

performance for its engines, attributing it to the FAA issued STC for installation of a rescue

hoist.  However, there was no increase in performance or improved takeoff performance with the

rescue hoist STC.  Instead, the computed gross weight figure used to meet the Tier 2 contract

specifications was derived from using the prohibited OEI 2½ Minute Power Available chart.

(Attachment #1 p10, 11; Attachment #3 p5-6).  Moreover, the falsified Power Available chart

labeled "RFMS #5" used in the contract proposals and included with other performance charts

for RFMS #6, was made up from a compilation of FAA source documents including RFMS #5,

RFMS #6 and RFMS #8.  (Attachment #3 p6-11).

### d.  Evaluation of Carson's Bid Proposals

During the contract evaluation process, the FS noticed that Carson's bid proposals

indicated its Sikorsky S-61 helicopters could carry a significantly higher payload over other

Sikorsky S-61 operators.  When questioned about it, Metheny told them that their helicopter

upgrades for the rescue hoist supplement increased performance over other S-61 operators and

were not available to other operators—providing the FS with another copy of the falsified 5 Minute Power Available chart labeled "RFMS #5" that actually contained the pictorial graph from an OEI 2½ Minute Power Available chart.  Again, the accurate FAA performance charts for the rescue hoist supplement did not increase helicopter performance.  (Attachment #1 p10; Attachment #3 p5).

The FS required accurate and recent W&B documents because the information was critical for evaluating the various contract proposals that were submitted and necessary for conducting safe flight operations, something the FS was ultimately after.  The *entire* contract proposals submitted by Carson would have been rejected if the FS had been aware of any falsified or even estimated helicopter weights were provided in their bid proposals.  Likewise, Carson's *entire* contract proposals would have been rejected if the falsified OEI 2½ Minute Power Available chart had been discovered.  (Attachment #1 p11-12).

The falsified W&B documents submitted for the helicopters underreported what these aircraft actually weighed.  By underreporting the helicopter weights and using the performance enhanced Power Available chart in Carson's bids, it made it appear the helicopters could safely lift heavier payloads and meet minimum contract performance specifications.

 **e.** <u>**Contracts Awarded**</u>

As a result of the materially fraudulent charts and representations by Metheny, and aided by Phillips, the FS awarded contract items under the LFS, CWN #1, IA and CWN #2 Contracts to various Carson helicopters.  The awards included option years.  (Attachment #1 p13; PSR ¶18).  The contracts were broken down to include a daily availability rate (DAR) and an hourly

flight rate for hours where flight services were actually rendered.  (Attachment #1 p2-3).

In 2008, the DAR for the LFS Exclusive Use Contract was $13,500/day for 150 days ($8,175,000) plus any additional flight hours performed.  Similarly, the DAR for the IA Exclusive Use Contract was $15,800/day for 120 days ($9,372,000) plus any additional flight hours performed.  The LFS and IA Exclusive Use Contract awards including option years for just the DAR totaled $51,699,000.  (Attachment #1 p13-14; Attachment #6; PSR ¶45).

In 2008, the FS paid Carson $18,831,891.12 total for the CWN#1, LFS and IA Contracts before the FS cancelled the contracts.  (Attachment #1 p14; PSR ¶¶19, 46).

## D.    FALSIFIED DOCUMENTS PLACED IN HELICOPTER FLIGHT MANUALS

Between June 23-25, 2008, Metheny, Harris and two other Carson management personnel visited several Carson helicopters in various states to prepare the aircraft for the upcoming FS inspections.  Metheny's purpose on the trip was to review W&B documents in the flight manuals.  He brought the W&B documents with him and caused the falsified W&B documents to be placed in the flight manuals of the aircraft.  (Attachment #2 p3-4, 11, 12, 13).  During the trip, Harris updated and standardized the aircraft flight manual by unknowingly inserting the falsified 5 Minute Power Available chart for RFMS #8 and #9 into the flight manuals that he had previously received from Metheny.  (Attachment #3 p12).

Metheny also caused the falsified W&B documents for N410GH and N905AL to be emailed to the Supervisory Mechanic in Perkasie, PA for inclusion in the flight manuals just before scheduled FS helicopter inspections at Carson's facility in Perkasie.  (Attachment #2 p7).  Metheny twice caused the falsified W&B documents for N612AZ to be sent to the Supervisory

Mechanic in Perkasie where they ended up in N612AZ's flight manual for two different inspections by the FS.  (Attachment #2 p14).

Later, while N103WF was in Grants Pass having seats and other equipment installed in preparation for the IA Contract, Metheny was observed removing the flight manual.  When it was returned, he told the crew chief the Chart C was now updated; however, the flight manual now had a different Chart C with a reduced weight even though no equipment had been removed.  (Attachment #2 p4).

In each case, the FS inspectors reviewed the falsified W&B documents in the flight manuals and determined they reflected the same weight presented in the contract proposals and contract and, accordingly, all the helicopters passed inspection.  (Attachment #1 p12; Attachment #2 p4, 7, 9, 10, 11-12).

## E.    DIFFERENT FALSIFIED PERFORMANCE CHARTS DISTRIBUTED TO PILOTS

At the start of the FS contracts in early July 2008, the FS had Carson pilots conduct load calculations using contract specifications.  When pilots couldn't meet the required 3,000 lbs. payload using the RFMS #6 performance charts, Metheny told Harris that the FS contracts were bid using RFMS #8 and #9 related to the rescue hoist.  When a pilot using the RFMS #8 performance charts from his flight manual still couldn't meet the required payload, Harris learned that the version Harris received previously from Metheny was different than the pilot's version.  Metheny told Harris that the pilot was using the wrong performance chart.  Metheny then told Harris that during the process of receiving the original RFMS #8 and #9, the FAA Designated Engineering Representative (DER) approved his request to adjust the performance

charts and that the original FAA approval date was kept for continuity purposes.  However, Dave

Thomas, the FAA approved DER on the rescue hoist (RFMS #8 and #9) project never approved

nor did Metheny ever make such a request; moreover, he did not have such approval authority, it

is retained by the FAA.  (Attachment #3 p12-14; Attachment #4 p5-6).

Metheny instructed Harris to ensure that all Carson pilots had these new RFMS #8 and #9

charts.  (Attachment #3 p13).  As instructed, on July 7, 2008, Harris emailed the new

performance charts he had previously received from Metheny to the company's pilots, directing

them to replace the flight manual's current 5 Minute Power Available chart for the rescue hoist

with the new charts attached to the email.  The RFMS #8 and #9 falsified 5 Minute Power

Available chart attached in the email contained the pictorial graph of a OEI 2 ½ Minute Power

Available chart.  (Attachment #3 p15; Attachment #4 p7).

When a FS official was meeting with Metheny and Harris just before the start of the FS

contracts, he requested copies of the performance chart pilots would be using for load

calculations to share them with the other FS helicopter managers.  Harris made copies from a

binder in Metheny's office and provided them to the FS official.  It included a falsified RFMS #8

5 Minute Power Available chart that contained the pictorial graph from an OEI 2 ½ Minute

Power Available chart.  The FS official emailed it to the FS managers assigned to Carson's

aircraft.  (Attachment #3 p14).

## F.    UTILIZING FALSIFIED POWER AVAILABLE CHART FOR PASSENGER
##       FLIGHTS

N61NH was one of the helicopters on the IA Contract.  When it was to be used for

passenger transport it was only capable of safely carrying 3 or 4 passengers according to the load

GOVERNMENT'S SENTENCING MEMORANDUM                              PAGE 13

calculations.  At the time, the pilot was using RFMS #7 for passenger flights.  HARRIS informed

Metheny about the aircraft having problems meeting contract payload specifications.  They

discussed the use of RFMS #8 and #9 for non-jettisonable (passenger) flights since they were

already being used for jettisonable (water dropping) flights for load calculations.  Metheny gave

Harris the approval to instruct the pilots to use the new charts for passenger hauling.  Harris also

checked with the FAA Principal Operations Inspector and the FS about the use of RFMS #8 and

#9.  They gave their approval, but were unaware that the charts were falsified.  With the use of

the falsified RFMS #8 Power Available chart, N61NH was now capable of carrying a higher

payload.  (Attachment #3 p16; Attachment #4 p7).

Harris then instructed Hutchison to email the other passenger hauling aircraft the same

information.  On July 23rd Hutchison emailed the information to those aircraft to use RFMS #8

and #9 for determining their load calculations and included the falsified RFMS #8 and #9

5 Minute Power Available chart.  When the FS helicopter manager for N4503E questioned the

use of the new chart with a substantial increase in power, a pilot called Metheny for an

explanation.  Metheny told the pilot that it was from new test flight data connected with the

rescue hoist.  Metheny explained that he decided to include the enhanced performance chart

when it was submitted to the FAA for approval.  He later received the approved STC back and it

had the enhanced performance chart stamped FAA approved.  It was now being distributed

because he had just received it from the FAA.  (Attachment #3 p16-17).

## G.    N612AZ HELICOPTER CRASH

On August 5, 2008, N612AZ crashed near Weaverville, California while conducting

GOVERNMENT'S SENTENCING MEMORANDUM                          PAGE 14

wildland firefighting operations.  The crash resulted in 9 fatalities and 4 were severely injured.

The pilots utilized the falsified RFMS #8 Power Available chart and falsified W&B documents

in determining their payload calculation for the flight.

1. **Falsified Weight and Balance Documents**

N612AZ was actually weighed on January 4, 2008 at Carson's facility in Perkasie by the

Supervisory Mechanic.  The Chart B weighing reflected an empty weight of 12,328 lbs.

(Attachment #2 p14).  In late March 2008, the Supervisory Mechanic had an external tank

installed on the aircraft thereby increasing the helicopters reported weight on the Chart C by

1,090 lbs., resulting in a total weight of 13,418 lbs.  (Attachment #2 p15).  On March 28th, in

response to Phillips' request for the W&B documents of N612AZ for Carson's contract proposal

to the FS, the Supervisory Mechanic emailed them to Phillip's assistant in Grants Pass.  It

consisted of all three Charts with the accurate information from the actual weighing and

subsequent addition of the tank.  (Attachment #2 p15; Attachment #4 p1).

Rather than submitting the accurate W&B documents for N612AZ from Perkasie in the

bid proposal, Metheny submitted falsified documents for the aircraft to the FS by using the

formula created by Phillips.  The falsified Chart B was one Hutchison typed based on the

falsified data provided to her by Metheny.  Moreover, the Chart A that was submitted listing how

the aircraft was equipped at the time of its weighing in Perkasie had been altered to reflect that

the external tank was installed on January 4, 2008 while the actual recorded items from Perkasie

were erased from the document.  Consequently, the aircraft's accurate weight was more than

1,400 lbs. more than the bogus bid weight of 12,013 lbs. submitted to the FS in the falsified

documents.  (Attachment #2 p14-15; Attachment #4 p2).

On two separate occasions, Metheny directed Hutchison to send the falsified W&B documents for N612AZ to the Supervisory Mechanic in Perkasie to be used during FS inspections of the helicopter.  On each occasion, as directed, she emailed them to the Supervisory Mechanic in Perkasie.  Each time the falsified W&B documents in N612AZ's flight manual reflected the weight presented in the contract proposal and it passed the FS inspection.  (Attachment #2 p15-16; Attachment #4 p3).  Shortly thereafter, passenger seats were added to the aircraft in Perkasie and, accordingly, the N612AZ Crew Chief updated the falsified Chart C in the flight manual to reflect a total increased weight to 12,408 lbs.  (Attachment #2 p16; Attachment #4 p3).

## 2.  Distribution of Falsified Power Available Performance Chart

When N612AZ arrived in California, pilots Roark Schwanenberg (Schwanenberg) and Aaron Lighter (Lighter) took over command of the aircraft.  In conducting load calculations for the FS, they were unable to meet contract payload specifications.  They called Carson's office in Grants Pass about it.  Phone records reveal that on July 3, 2008, Schwanenberg called Metheny and they had a 47-minute conversation.  (Attachment #3 p14-15; Attachment #4 p3-4).  Metheny mentioned this telephone conversation with Schwanenberg to Harris when they were discussing pilots not being able to meet the required 3,000 lbs. payload using the RFMS #6 performance charts.[4]  Metheny told Harris that Schwanenberg had been confused about which charts to use for

_____

[4] It was during this conversation that Metheny told Harris that the FS contracts were bid using RFMS #8 and #9 that related to the rescue hoist.  (Attachment #4 p5).

GOVERNMENT'S SENTENCING MEMORANDUM                                    PAGE 16

load calculations and contacted him for clarification.  (Attachment #3 p13-15; Attachment #4 p4-5).

On July 4, 2008, an email was sent from Phillips email account to Lighter.  It contained a single page attachment of the falsified RFMS #8, 5 Minute Power Available chart with the pictorial graph of the OEI 2 ½ Minute Power Available chart.  Phillips has denied sending the email.  (Attachment #3 p15; Attachment #4 p4).

Lighter used the falsified RFMS #8, 5 Minute Power Available chart in conducting load calculations for the FS and they were now able to meet contract payload specifications.  The new chart increased power over the original chart they used.  Schwanenberg and Lighter both recognized the pictorial graph as providing the same engine torque readings as the OEI 2 ½ Minute Power Available chart.  However, Lighter did not suspect the document to be falsified and believed it had been approved by the FAA.  He thought the increase in power was the result of flight tests conducted by Carson for a new rescue hoist supplement.  (Attachment #3 p15; Attachment #4 p4).

On July 23, 2008, as noted above, after RFMS #8 was approved for use with non-jettisonable (passenger) flights, the falsified RFMS #8, 5 Minute Power Available chart was again emailed to the passenger hauling aircraft, including the pilot of N612AZ.  (Attachment #4 p8).

### 3.  <u>August 5, 2008 Crash</u>

On August 5, 2008, N612AZ was assigned to the Trinity Helibase in California.  It was tasked with a mission to relocate firefighters at helspot 44 (H-44) to helspot 36 (H-36).

GOVERNMENT'S SENTENCING MEMORANDUM                                              PAGE 17

N612AZ crashed during takeoff at H-44 while conducting wildland firefighting operations. Schwanenberg (now deceased) was the pilot-in-command and William Coultas (Coultas) was the co-pilot. FS Helicopter Inspector Pilot James Ramage (Ramage-deceased) took over the responsibilities of the flight attendant; FS flight squad leader Matthew Lingenfelter (Lingenfelter) was the helispot manager at H-44 and FS senior fire engine operator Josiah Obst (Obst) was the helispot manager at H-36. (Attachment #4 p8).

Schwanenberg prepared the load calculation for the mission. He determined the maximum allowable non-jettisonable payload to be 2,552 lbs. However, this payload figure was based upon the falsified W&B documents and the falsified power available chart. (Attachment #4 p8).

The NTSB investigation determined that Schwanenberg used an aircraft equipped weight of 12,408 lbs.[5] in calculating the aircraft's allowable payload which was based upon the false Chart B that Metheny created using Phillip's formula. The NTSB determined N612AZ's actual equipped weight to be 13,845 lbs., which was based upon the legitimate January 4, 2008 weighing in Perkasie and included the subsequent installation of equipment including the external tank on March 25, 2008. The aircraft was 1,437 lbs. heavier than the weight figure used by the pilots in their load calculation. (Attachment #2 p16; Attachment #4 p8-9).

Lingenfelter was responsible for ensuring that the load manifests prepared for the shuttle mission did not exceed the aircraft's allowable payload figure because it must be less than the

---

[5] This was the weight on the falsified Chart C in the flight manual after it was updated with the installation of the passenger seats in Perkasie. A copy was maintained at the Trinity helibase. (Attachment #2 p16; Attachment #4 p3, 5).

payload figure for the safe operation of an aircraft.  He communicated the manifested 2,355 lbs.

weight to Schwanenberg and Coultas.  (Attachment #4 p8).  <u>Most importantly</u>, if Lingenfelter

had known at the time that the load calculation for N612AZ was so inaccurate he would have

halted the operation in order to determine the reason for the discrepancy.  It is very important for

load calculations to be accurate to ensure the safety of a flight.  Moreover, Obst relied on the

load calculation forms in manifesting a flight, with concern about safety over maximizing the

aircraft's payload.  (Attachment #4 p9).

     The NTSB investigation also determined Schwanenberg used the falsified RFMS #8

Power Available chart to calculate the allowable payload.  The falsified chart was labeled as 5

Minute Power Available, but actually contained the pictorial graph from an OEI 2 ½ Minute

Power Available chart.[6]  Consequently, not only were the pilots unknowingly using falsified

W&B documents in determining their payload calculations for the flight, but a falsified power

performance chart.

     Using a legitimate RFMS #8 5-Minute Power Available chart, the NTSB investigation

determined the weight at which N612AZ could safely hover (17,550 lbs.); the NTSB

investigation also determined the total gross weight of the helicopter including firefighters, crew

members, and fuel at the time of the crash (19,008 lbs.).  This resulted in N612AZ being 1,458

lbs. over the weight (17,550 lbs.) to safely hover the aircraft and, accordingly, over the maximum

―――――――――――――――――――

[6] This was the same falsified RFMS #8, 5 Minute Power Available chart emailed on July 4th to
Lighter/Schwanenberg to meet contract payload specification, emailed to Carson pilots on July
7th and again on July 23rd to the passenger hauling aircraft.  (Attachment #3 p15-16; Attachment
#4 p7, 9).

GOVERNMENT'S SENTENCING MEMORANDUM              PAGE 19

allowable payload for safely transporting the firefighters.  (Attachment #4 p9).

Coultas, the co-pilot of N612AZ who was severely and permanently injured in the crash, was unaware the RFMS #8 5-Minute Power Available chart was falsified.  If he had known, he would have never used it.  According to Coultas, a pilot has to trust the integrity of the power charts and Chart Cs in the aircraft flight manual with their life.  Moreover, in conducting load calculations, he has to trust the weight listed on the Chart C as being true and accurate, and that the aircraft was actually weighed.  The weight of a helicopter dictates the payload.  The correct weight is vital in planning the safe operation of the helicopter.  If the weight of the helicopter is wrong, the final payload will be wrong.  Coultas points out, pilots are taught from day one in flight school, charts don't lie.  They are trained to stay within the parameters established by the charts and the aircraft can perform as represented by the charts.  (Attachment #4 p9-10).

Within days after the crash, Metheny submitted a request to the FS to replace the crashed helicopter with another Carson helicopter, N410GH.  As part of that request, he submitted the same falsified data and W&B documents he had submitted earlier to the FS with the original contract bid proposals.  As a result of Metheny's fraudulent representations, the FS modified the contract by substituting N410GH effective August 18, 2008.  (PSR ¶27).

## H.   CONCEALING INFORMATION

### 1.   Falsified Weight and Balance Documents

After the crash, Carson's Chief Inspector collected the records for N612AZ and shipped them from Grants Pass to Carson's facility in Perkasie.  After the records were shipped, and in response to Metheny's inquiry, Phillips contacted Perkasie and confirmed that the box shipped

contained the W&B documents.  Metheny then wanted to know whether the format of the documents were either in the Sikorsky format or in Carson's FAA Part 135 certificate format.[7]  The legitimate January 4, 2008 Chart B weighing for N612AZ was in the Sikorsky format while the falsified Chart B was in Carson's FAA Part 135 format.  After Phillips suggested Metheny check with the Supervisory Mechanic in Perkasie, phone records indicate that Metheny had a 36 minute conversation with him on September 15, 2008.  (Attachment #4 p10).

From September 15, 2008 through September 19, 2008, an NTSB Investigator and several other members of the crash investigation team visited Carson's facility in Perkasie to review records of N612AZ.  He requested to review all of the records.  (Attachment #4 p10).  As part of his review, the NTSB Investigator was looking for W&B documents for N612AZ.  The NTSB Investigator obtained a copy of the falsified Chart B and Chart A that Metheny had submitted in the contract proposal to the FS.  The Chart A had reflected that N612AZ had previously been weighed on August 11, 2007.  The NTSB Investigator located a copy of the corresponding August 11, 2007 Chart B weighing but it was another bogus chart, falsely listing Carson's Vice President in Perkasie as the preparer of the document and with his first name misspelled.  However, the authentic Chart B for the August 11, 2007 weighing was never provided.[8]  (Attachment #4 p11).  The legitimate Chart B for the actual weighing of N612AZ on January 4, 2008 by the Supervisory Mechanic was never provided to the NTSB Investigator

_____

[7] Carson used a different Chart B format than the customary Sikorsky format when recording weights for aircraft listed on their FAA Part 135 certificate.  (Attachment #4 p10).

[8] The authentic Chart B for the August 11, 2007 weighing was actually prepared and dated on August 15, 2007, with an aircraft weight of 13,073 lbs.  (Attachment #4 p11).

GOVERNMENT'S SENTENCING MEMORANDUM                    PAGE 21

during his review of the aircraft records.  Although the Supervisory Mechanic was unable to remember weighing the crash aircraft, NTSB eventually discovered the legitimate W&B documents from the actual weighing of N612AZ on January 4, 2008 by the Supervisory Mechanic after receiving documents pursuant to their subpoena.  (Attachment #4 p12).

Because Metheny used the formula to complete the bogus Chart B's, the individual scale readings within each Chart B were expressed to the tenth of a pound, while Carson's scales only produced readings in whole numbers.  (Attachment #2 p6-7).  During the NTSB investigation, Phillips learned that there were Chart B's listing weights to a tenth of a pound.  Recognizing Carson scales did not produce readings in decimals, he confronted Metheny about it in the presence of Carson's General Manager.  Metheny was surprised, instructing Phillips to see if there was a way to make the scales produce readings in decimals.  Phillips' attempt was unsuccessful.  (Attachment #2 p7).

Moreover, despite NTSB investigative subpoenas, none of the subpoenaed documents ever included the July 7, 2008 e-mail from Harris to all the pilots which contained the falsified RFMS #8 and #9 Power Available Charts.  Nor did Carson personnel on the NTSB crash investigation team including Metheny as a party representative for Carson, ever make NTSB investigators aware of the e-mail's existence despite numerous questions regarding the origin of the charts.  (Attachment #4 p12).

**2.  Falsified Power Available Chart**

In late September 2008, an NTSB Investigator discovered the 5 Minute Power Available chart for RFMS #8 used by N612AZ contained the pictorial graph from an OEI 2 ½ Minute

Power Available chart after she compared it to an actual copy of RFMS #8 from the FAA

Aircraft Certification Office.  (Attachment #3 p17).

     Metheny told the NTSB Investigator he didn't know the source of the falsified Power

Available chart but suspected that Carson's former Director of Operations may have been behind

it.[9]  (Attachment #3 p17).  However, Metheny personally received the new rescue hoist

supplement (RFMS #8 and #9) from Perkasie when it arrived and later provided Hutchison with

copies.  She scanned them to Carson's computer server and put hard copies in her notebook.

Later, after telling Hutchison that she had a bad chart in her notebook, Metheny replaced it with

another chart from his desk.  Yet, it was confirmed during the NTSB investigation that the

electronic version Hutchison scanned to Carson's computer server were legitimate RFMS #8 and

#9 Power Available Charts.  (Attachment #3 p18).

     A computer forensics company was hired by Carson to determine the source of the

falsified Power Available charts.  They concluded the falsified charts were not created by using a

computer, but rather by physically making changes to a hard copy of the genuine chart.  The

alteration occurred at Carson's Grant Pass office and that the genuine FAA approved

performance charts maintained in hard copy were replaced with the altered versions of the charts

by an individual(s) who had physical access to the office during the period between April 1,

---

[9] In 2007, the former Director of Operations and Metheny had a falling out with one another.  He accused Metheny of inappropriately changing aircraft equipped weight on an aircraft Carson bid on a FS Call-When-Needed contract thereby jeopardizing safety and of misappropriating grant monies intended for Carson's facility to pay another helicopter company for parts.  The former Director of Operations resigned before being terminated.  (Attachment #3 p18).

GOVERNMENT'S SENTENCING MEMORANDUM          PAGE 23

2008 and April 5, 2008.  (Attachment #3 p19).

The former Vice President of Carson in Grants Pass confronted Metheny about people's belief that Metheny was responsible for the falsified power available chart.  In response, Metheny did not deny it, but said, "Let 'em try and prove it."  (Attachment #3 p19).

## I.    FOREST SERVICE WEIGHING OF HELICOPTERS

As a result of the crash of N612AZ, the FS conducted a contract compliance inspection on Carson's helicopters, eventually bringing about the weighing of each helicopter.  Prior to the FS weighing, some of the aircraft were weighed by Carson in Grants Pass.  They were found to weigh more than indicated by their W&B documents with one pilot characterizing the overage as considerable.  (Attachment #1 p14; Attachment #2 p17).

### 1.  <u>Concealing the Fraud</u>

Metheny and Phillips devised various schemes in an attempt to prevent the FS from discovering the aircraft's true weights.  Metheny talked to Phillips about removing equipment from the helicopter (e.g., auxiliary battery, bifilar weights, and heater) to reduce the aircraft's weight without recording its removal on the helicopter's Chart C as well as removing the inner components from the battery and putting the battery's empty shell back in the aircraft. (Attachment #2 p17; PSR ¶42).

Metheny directed Phillips to inform the FS inspector coming to weigh N7011M that Carson's scales had a problem and could not be used, even though there was no problem with the scale at that time.  This caused the inspector to leave without being able to weigh the helicopter. (Attachment #2 p17; PSR ¶41).  Metheny also instructed Phillips to ask one of the helicopter's

crew chiefs to remove the helicopter's bifilar weights; however, the crew chief refused, explaining that he was done lying about the helicopter's weight.  (Attachment #2 p17-18; PSR ¶43).  Later, they discussed the possibility of manipulating the aircrafts fuel gauges making it appear the aircraft was loaded with more fuel than it really was, thereby making the aircraft appear lighter when weighed.  (Attachment #2 p18; PSR ¶44).

Metheny had another Carson employee instruct one of N103WF's pilots to remove the bifilar weights before the FS weighing; however, the pilot refused.  (Attachment #2 p18; PSR ¶43).

Phillips also had discussions with Carson mechanics about removing bifilar weights, a battery, and a fuel cell from N61NH before the helicopter's FS weighing.  (Attachment #2 p18).

### 2.  **Helicopter Weighing**

The FS weighed N61NH and N7011M.  The weighing revealed that N61NH was 432 lbs. over the bid weight and N7011M was 451 lbs. over the bid weight.  Both aircraft were subsequently flown to Carson's facility in Grants Pass where they were again weighed using the company's own set of scales and confirmed the accuracy of the FS weighing.  The FS weighing of the other helicopters revealed that they all ranged from 113 to 710 lbs. heavier than the bid weights submitted in Metheny's contract proposals.  (Attachment #1 p15; Attachment #2 p18; PSR ¶23).

The bid weight for N612AZ including the equipment to carry passengers was 12,342 lbs. The NTSB investigation concluded the equipped weight of N612AZ on August 5, 2008 was actually 13,845 lbs. while the falsified weight that the N612AZ pilots used in calculating their

allowable payload was 12,408 lbs. The difference between the weight of N612AZ as determined by NTSB and the bid weight was 1,503 lbs., and 1,437 lbs. over the aircraft weight used by the pilots in calculating their allowable payload. (Attachment #1 p15; Attachment #4 p8-9; PSR ¶23).

## J.    TERMINATION OF THE CONTRACTS

The FS terminated the LFS and IA Contracts with Carson in their entirety. It concluded that all of its helicopters under contract violated FAA regulations by using a falsified performance chart in its operations.

The falsified performance chart was made available to flight crews for calculation of performance capability while conducting flight operations. Use of the chart would directly impact the final calculation of allowable weight the helicopter would be capable of safely carrying. Moreover, Carson failed to submit accurate weight data during the performance of the contract. Incorrect data compromises the allowable payloads, which in turn affects flight safety for contract and agency personnel both in the air and on the ground. The allowable payload determines how much a weight the aircraft can carry for the current environmental conditions, and if it is incorrect, safety is compromised. (Attachment #1 p15-16).

## GUIDELINE CALCULATION

There is not total agreement on the guideline calculation in this case. In calculating Metheny's guideline range, the parties have agreed pursuant to a plea agreement that the Conspiracy to Commit Mail and Wire Fraud has a base offense level of 7; the fraudulent scheme used in the conspiracy to defraud the Forest Service was committed by sophisticated means for

an additional 2-levels in the offense level; Metheny abused a position of private trust and used a special skill to significantly facilitate the commission and concealment of the offense for an additional 2-levels.

However, disagreement exists about whether the offense involved the reckless risk of death or serious bodily injury and the amount of loss.  The government contends that the offense involved the reckless risk of death or serious bodily injury for an additional 2-level increase in the offense level.  The government also contends that the amount of intended loss was over $50,000,000 for an additional 24-level increase in the offense level.

The Presentence Report also includes an additional 2-level increase in the offense level for Metheny's leadership role in the offense.

The total offense level is 36 with the upward adjustments as noted above and a 3-level downward adjustment for acceptance of responsibility.  Metheny has no prior criminal history. The advisory guideline range is 188 – 235 months imprisonment.

## SECTION 2B1.1 LOSS CALCULATION

### A.    ACTUAL OR INTENDED LOSS

Under U.S.S.G. §2B1.1(b)(1)(a), the base offense level for a crime involving conspiracy to commit wire and mail fraud is seven because the statutory maximum term of imprisonment is 20 years or more.  See 18 U.S.C. §§ 1341, 1343 and 1349.  The base offense level is increased incrementally depending on specific offense characteristics, including the amount of monetary loss from the fraud.  U.S.S.G. §2B1.1(b)(1).  The sentence of a defendant convicted of a federal fraud offense should reflect the nature and magnitude of the loss caused or intended by his crime.

GOVERNMENT'S SENTENCING MEMORANDUM                                    PAGE 27

*See* U.S.S.G. §2B1.1(b)(1), Background Comment.  "[A]long with other relevant factors under the guidelines, loss serves as a measure of the seriousness of the offense and the defendant's relative culpability and is a principal factor in determining the offense level" under §2B1.1.  *Id.*

In determining the amount of loss, the greater of the actual or intended loss applies. U.S.S.G. §2B1.1 app. n. 3(A).  In other words, where the intended loss is greater than the actual loss, the intended loss is to be used.  Actual loss "means the reasonably foreseeable pecuniary harm that resulted from the offense."  Intended loss is "the pecuniary harm that was intended to result from the offense and includes intended pecuniary harm that would have been impossible or unlikely to occur.  *Id* at (i) and (ii).  Pecuniary harm is "harm that is monetary or otherwise readily measured in money," and "reasonably foreseeable pecuniary harm" means "pecuniary harm that the defendant knew or, under the circumstances, reasonably should have known, was the potential result of the offense."  *Id* at (iii) and (iv).  Importantly, the court need only make a reasonable estimate of the loss based on available information.  U.S.S.G. §2B1.1 app. n. 3(A).

In situations where the application of the traditional theft-loss definition does not accurately reflect the facts of the fraud, the Ninth Circuit instructs district courts "to take a *realistic, economic approach* to determine what losses the defendant truly caused or intended to cause."  *United States v. West Coast Aluminum Heat Treating Co*, 265 F3d. 986, 991 (9th Cir. 2001).  (emphasis in original).  As part of that approach, the Court pointed out it has not hesitated to hold defendants responsible for the full reach of their intent, using the loss they attempted to inflict if the intended loss can be determined and is greater than the actual loss.  *Id* at 991.  In the present case, the actual and intended loss can reasonably be determined.

GOVERNMENT'S SENTENCING MEMORANDUM                                    PAGE 28

As noted above, the FS awarded contracts with option years to various Carson helicopters as a result of Metheny's fraudulent representations.  (Attachment #1 p13; PSR ¶18).  The contracts were broken down into two payment components: a daily availability rate and an hourly flight rate for hours where flight services were actually rendered.  (Attachment #1 p2-3).  In awarding the Exclusive Use Contracts, the FS guaranteed that the daily payment rate would be paid over the entire mandatory availability period regardless of whether flight services were actually rendered.  The Call-When-Needed Contracts received both a set daily availability rate and hourly amount when actually rendering services on an as-needed basis.  (Attachment #1 p2).

For the 2008 base year, the daily availability rate for the LFS Exclusive Use Contract was $13,500/day for 150 days ($8,175,000) plus any additional flight hours performed.  Similarly, the daily availability rate for the IA Exclusive Use Contract was $15,800/day for 120 days ($9,372,000) plus any additional flight hours performed.  Thus, the 2008 base year amount for just the daily availability component for the two exclusive use contracts totaled $17,547,000.  (Attachment #1 p13-14; Attachment #6; PSR ¶45).

For 2008, the FS actually paid Carson $11,313,888.12 for daily availability and an additional $7,518,003 for hourly flight services rendered for the CWN#1, LFS and IA Contracts before the FS cancelled the contracts.  The amount totaled $18,831,891.12.  (Attachment #1 p14; PSR ¶¶19, 46).

However, the total value of the entire LFS and IA Exclusive Use Contracts including option years for just daily helicopter availability amounted to $51,699,000.  (Attachment #1 p13-14; Attachment #6; PSR ¶45).  There were no legitimate services rendered for this component of

GOVERNMENT'S SENTENCING MEMORANDUM                                      PAGE 29

the contracts.  The FS would have rejected the entire contract proposals if they had known about

the falsified helicopter weights or had discovered the falsified Power Available chart, both used

to meet minimum contract specifications.  Metheny intended for Carson to receive guaranteed

daily payments from the FS for merely having helicopters available that failed to meet the

required minimum contract specifications, resulting in an intended loss of $51,699,000.

Therefore, since the intended loss is greater than the actual loss in this case, it therefore applies.

U.S.S.G. §2B1.1 app. n. 3(A).

**B.    CREDIT AGAINST LOSS**

Under U.S.S.G. §2B1.1 app. n. 3(E), the amount of loss is to be reduced by the fair

market value of the services rendered by the defendant or other persons acting jointly with him,

to the victim before the offense was detected.  Defendant has the burden of proving that he is

entitled to a credit against the amount of loss.  *United States v. Howard*, 894 F.2d 1085, 1090

(9th Cir. 1990) ("[T]he government should bear the burden of proof when it seeks to raise the

offense level and…the defendant should bear the burden of proof when the defendant seeks to

lower the offense level."); *see also United States v. Felix*, 561 F.3d 1036, 1043-44 (9th Cir.

2009) (quoting *Howard*).

In this case, Carson was paid $18,831,891.12.  They received $11,313,888.12 for daily

availability and an additional $7,518,003 for hourly flight services rendered.  As noted above, no

legitimate services were rendered by merely having the daily availability of helicopters that

failed to meet the required minimum contract specifications of the FS.  Consequently, Metheny

is not entitled to any credit against the intended loss.  Accordingly, the amount of intended loss is

more than $50,000,000 and the offense level should be increased by 24 levels.  U.S.S.G. §2B1.1(b)(1)(M); PSR ¶53.

Moreover, even the additional $7,518,003 for hourly flight services is in question.  Pilots had problems meeting the contractually required payload without the falsified charts.  This resulted in costing the FS more than was necessary.

When N61NH pilots had problems meeting the necessary payload for carrying passengers, the FS believed a smaller Bell helicopter could carry as many passengers as N61NH while costing them half as much.  But when the pilots received the falsified power available performance chart for load calculations, it provided more power indicating they could carry a higher payload.  (Attachment #3 p16; Attachment #5 p6-7).  Likewise, pilots assigned to other aircraft experienced the same problem in meeting the required payload when a different and less costly type of helicopter was able to carry the same payload.  But when they received the falsified performance charts it significantly increased their available payload.  (Attachment #5 p6).  Moreover, pilots of N103WF and N410GH reported that they were never able to carry the payload indicated by their load calculations—such as, load calculations indicating a capability of carrying 600 gallons of water while only being able to carry 400 gallons.  Other pilots even underreported the amount of fuel and cargo in load calculations thereby making the payload appear higher, as well as over-reporting the number of gallons of water dropped on a fire, thereby avoiding questions from the FS.  (Attachment #5 p7-8).  Based on this information, it is obvious that Carson was paid more than the fair market value for the services they actually rendered.  Therefore, Metheny would not even be entitled to full credit for the hourly flight

services rendered against the actual loss in this case.

Notwithstanding, even if the entire $18,831,891.12 paid to Carson was credited against the intended loss, the result is still $32,867,109. As a result, the offense level is still increased 22 levels, rather than 24 levels.

## SECTION 2B1.1 RISK OF SERIOUS BODILY INJURY

Under U.S.S.G. §2B1.1(b), the base offense level shall be increased by two levels if the offense involved "the conscious or reckless risk of death or serious bodily injury." U.S.S.G. §2B1.1(b)(15).[10]

In *United States v. West Coast Aluminum Heat Treating Co*, 265 F3d. 986, 992-94 (9th Cir. 2001), the Court upheld the two-level enhancement where the contractor falsely represented that aluminum alloy parts it supplied for the military, some of which were "flight critical" or used in "flight critical" parts, had been subjected to heat treating and testing required by contract. The district court adopted the PSR's findings and conclusions in arriving at the enhancement, observing in part, that it was reasonable to assume that defendants knew (or should have known) that the parts that they were dealing with were of the nature that not properly heat treated and inspected would put at risk the aircraft for which they were intended, yet defendants were willing to risk the possibility that some of the parts could cause malfunction in the aircraft. Id at 992-93. Defendant argued that the enhancement was not justified because no injuries ever occurred, none were ever intended and only "18 out of hundreds of thousands" of parts were allegedly defective

---

[10] This specific offense characteristic is the same under earlier versions of the Guidelines Manual: U.S.S.G. §2B1.1(b)(12)(November 1, 2007); U.S.S.G. §2B1.1(b)(13)(November 1, 2008).

GOVERNMENT'S SENTENCING MEMORANDUM                    PAGE 32

over the 20 year life of the fraud.  In rejecting their argument, the Court stated:

> "To put it bluntly, West Coast knew that it was putting the men and women of the United States armed forces in harm's way.  The fact that there have been few documented part failures is quite beside the point.  A district court need not engage in a sophisticated probability analysis to apply the adjustment.  When the consequences of failure are catastrophic, a low failure frequency is of limited relevance.  It is the creation of risk, not the infliction of injury, that is required for application of this guideline provision.  A district court does not abuse its discretion in applying it when the defendant has acted in conscious or reckless disregard of a known risk of serious bodily injury even if the ultimate probability of occurrence is found to be relatively low."

*Id* at 993.  The Court also noted a similar situation was involved in *United States v. Johansson*, 249 F.3d 848 (9th Cir. 2001) (finding that it was apparent from the nature of defendant's offense itself—creating false driver logbooks to conceal federal hours-of-driving violations—that the offense involved the risk of serious bodily injury).  Consequently, only some evidence that the conduct created a risk of serious injury is required and that the nature of the offense can support a finding that a defendant was subjectively aware of the risk his conduct created while no showing that injury did or was likely to occur is necessary.  *United States v. Thorsted*, 439 Fed.Appx. 580 (9th Cir. 2011).

In similar fashion as *United States v. West Coast Aluminum Heat Treating Co*, to put it bluntly, Metheny knew that the falsified charts put firefighters and pilots in harm's way.  Consequently, the base offense level should be increased by two levels because the offense involved "the conscious or reckless risk of death or serious bodily injury."  (PSR ¶55).

Metheny submitted the contract bid proposals to the Forest Service (FS) with falsified helicopter weight and balance (W&B) charts and falsely altered helicopter performance charts.  Appallingly, he also caused the distribution of the falsified helicopter W&B charts as well as

other falsely altered helicopter performance charts to pilots and helicopter flight manuals for their use in the field.  Tragically, unaware of the false nature of the charts, the falsified charts were then used by pilots, FS personnel and others in performing wildfire flight operations.  They were relied on to calculate the helicopter's maximum payload capacity during firefighting operations thereby risking the life and safety of pilots, firefighters and others.

There are no safety margins built into the OEI 2 ½ Minute Power Available chart unlike the 5 Minute Power Available chart.  Its use for load calculations would be a wanton disregard for the safety of the aircraft and passengers because it would leave no safety margin for any flight maneuvers. Moreover, a pilot's use of a chart labeled as 5 Minute Power Available, but in actuality was the OEI 2 ½ Minute Power chart, would give the pilot a false sense of security, believing he had more power in reserve in the event of an emergency, such as one engine failure. The purpose of load calculations is to determine the safe weight at which to operate the helicopter; they are essential in helicopter firefighting, since most missions are conducted in steep terrain, high density altitudes, and unpredictable winds.  The use of such falsified information becomes even more dangerous when conducting non-jettisonable flights because passengers and internal cargo cannot be jettisoned in the event of an emergency.  (Attachment #3 p2; Attachment #4 p12-13).

As noted above, had the co-pilot of the crash helicopter known the charts (RFMS #8 5-Minute Power Available and W&B charts) were falsified he would never have used them.  Pilots have to trust the accuracy of their charts with their life.  Pilots are trained that by staying within the parameters established by the charts, their aircraft will perform as represented.  Besides, the

NTSB investigation revealed that N612AZ was 1,458 lbs. over the weight to safely hover the aircraft and, accordingly, over the maximum allowable payload for safely transporting the firefighters.  (Attachment #4 p9-10).

Moreover, other Carson pilots expressed how important the accuracy of those charts is to the safety of a flight.  For example, one pilot stated it was "super critical" when flying passengers that pilots have accurate W&B documents, because passengers cannot be jettisoned if an aircraft is too heavy; another pilot believed that falsification of those charts posed a significant threat to safety, while two other pilots likened the falsification to trying to kill someone; and, yet another pilot said that accurate W&B documents and performance charts are integral to the safe operation of aircraft, especially when flying passengers—falsification was unethical, illegal and put people's lives on the line.  (Attachment #5 p2-4).

## OTHER OFFENSE CONDUCT AND MISAPPROPRIATION OF ASSETS

For a lengthy period of time, Tami Hutchison (Hutchison), the Assistant Director of Operations for Carson, noticed that Metheny had a close relationship with the owner of a local aviation business (Aviation Owner).  She became aware of several questionable transactions involving the transfer of Carson assets to the Aviation Owner.  Eventually, her concerns became so great that on August 3, 2009 she emailed a corporate officer in Perkasie, Frank Carson's wife. In describing her concerns, Hutchison was worried about a backlash on her job since she reported directly to Metheny and was uncomfortable because she was asked to lie to both Frank Carson and his wife.  Hutchison and Frank Carson's wife began an in-depth investigation. (Exhibit #7 p3; PSR ¶70).

GOVERNMENT'S SENTENCING MEMORANDUM                                    PAGE 35

## A.    MISUSE OF CARSON CREDIT CARD

Metheny used a Carson credit card to make a number of unauthorized purchases.  He purchased tires for his wife's vehicle ($836.36) and a watch for his wife ($3,495) from a local jewelry store.  Metheny later reimbursed Carson.  He also purchased a $4,716.13 watch from a jewelry store in Abu Dhabi, claiming it was for Carson clients.  Yet, a Carson employee present when the purchase was made understood it was for Metheny.  (Exhibit #7 p3-4; PSR ¶67).

## B.    RENOVATIONS AT METHENY'S RESIDENCE

An invoice dated July 16, 2008, for $4,257.90 was located by Hutchison.  She recalled that Metheny wanted to run the invoice through Carson's account.  When he found out that Carson people in Perkasie, Pennsylvania would not see it, he instructed her to issue the check and to code it "Building Improvements."  Later, she confirmed with the company on the invoice that it was for gravel, grading and paving of the driveway at Metheny's residence.  (Exhibit #7 p8; PSR ¶68).

## C.    TRANSFER OF FUEL

In January 2009, Metheny shipped 7,450 gallons of jet fuel to a private party he knew in Cougar, Washington.  He told Carson personnel not to invoice the person for the fuel because they were to provide helicopter parts to Carson in exchange.  Carson never received payment or parts for the fuel.  (Exhibit #7 p69; PSR ¶69).

## D.    UNAUTHORIZED PURCHASE/MISAPPROPRIATION OF HELICOPTERS PARTS

Metheny had two checks totaling $12,000 issued for the purchase of helicopter parts.  He told Hutchison that some of the parts would be used by Carson, the others would be sold.  Frank

GOVERNMENT'S SENTENCING MEMORANDUM                              PAGE 36

Carson's wife discovered that the Aviation Owner was selling the parts on the internet. According to the Aviation Owner, Metheny approached him about selling the helicopter parts as a sales agent for Carson. Metheny told him that Frank Carson agreed to run the sales through Metheny's own private business, Sentry Aviation.

In June 2008, Metheny approached Hutchison informing her he intended to buy some helicopter parts, apparently not as a Carson representative because he mentioned not having his checkbook. He instructed Hutchison to write a $16,000 check for the purchase. Metheny said he would bring in a personal check the next day however, he has never repaid Carson. The parts subsequently purchased were transferred to the Aviation Owner for re-sale.

When Hutchison requested documentation from the Aviation Owner about the parts that had been transferred to him, Metheny called Hutchison and told her that he would take care of it. Later, Hutchison received documentation from the Aviation Owner that showed checks were issued to Metheny and Sentry Aviation, seven checks between April 14, 2009 and August 6, 2009 and one check in June 2008. The checks totaled $73,900.

In an October 2009 letter to the Aviation Owner, Carson informed him that they were aware that a substantial amount of helicopter equipment and parts were sold utilizing his company. That they were removed illegally from Carson and the sales were not authorized. On October 19, 2009, Carson received a letter from an attorney representing Metheny. Enclosed was a cashier's check to Carson in the amount of $73,900, issued as restitution from Metheny to Carson for the unauthorized sale of the helicopter parts. (Exhibit #7 p5-7; PSR ¶¶71-75).

**E.    THEFT OF HELICOPTER TAIL ROTOR BLADES**

In June of 2009, a Carson employee in Grants Pass inventoried and loaded helicopter parts and equipment on a flatbed trailer for transport to the Carson facility in Perkasie, Pennsylvania.  The items included six wooded crates, each containing a helicopter tail rotor blade and each valued at approximately $85,000.00.  Later, the employee noticed the straps he used to secure the tail rotor blades were configured differently.  Upon closer inspection, he discovered three of the crates missing from the load and reported it.  A review of video from Carson's security system revealed a person believed to be Metheny walk around the trailer and then later leave the Carson building and enter a white truck.  The surveillance cameras did not capture the entire trailer including where the tail rotor blades were secured on the trailer.  None of the surveillance cameras captured the white truck leaving the main Carson gate indicating it took a circuitous route thereby avoiding the video security system.  (Exhibit #7 p1-2; Exhibit #7p2-Exhibit 2; PSR ¶65).

Metheny informed Carson staff that he would handle notifying Frank Carson about the theft.  However, Frank Carson was never notified and the theft was not reported to police until September 9, 2009.  (Exhibit #7 p2; PSR ¶65).

On October 1, 2009, the three missing crates containing the tail rotor blades were delivered to Carson by Dash Delivery of Central Point, Oregon.  The shipping invoice identified the shipper as Warthog Aviation, an entity owned by Carson's former Director of Operations. Metheny reportedly held animosity toward him.  He had accused Metheny of inappropriately changing aircraft equipped weight on Carson's previous FS contract bids and misappropriating

GOVERNMENT'S SENTENCING MEMORANDUM                    PAGE 38

grant monies intended for Carson's facility to pay another helicopter company for parts.  He resigned before being terminated by Metheny.  (Exhibit #2 p2; Exhibit #3 p18; PSR ¶66).

Further investigation with Dash Delivery revealed that their caller id determined the telephone number used to schedule the shipment originated from Metheny's telephone number.  The manager of Dash Delivery was also able to identify Metheny from a photograph as the person who shipped the crates and provided the information for the shipping invoice.  (Exhibit #7 p2; PSR ¶66).

## SENTENCING RECOMMENDATION

In this case, a 188-month term of imprisonment for defendant Steven Metheny is appropriate and reasonable considering the applicable guideline range and based on the factors outlined in 18 U.S.C. § 3553(a)–that is, the sentence contemplate the nature and circumstances of the offense and the history and characteristics of the defendant, reflects the seriousness of the offense, promotes respect for the law, provides just punishment for the offense, affords adequate deterrence to criminal conduct, and protects the public from further crimes of  the defendant.

Metheny was the architect behind the scheme to defraud the FS and gain a significant advantage over his competitors for FS contracts.  He had enormous power and authority at Carson Helicopters in Grant Pass, and had the complete trust and confidence of Frank Carson, the founder and President of Carson Helicopters.  He used his position to not only manipulate people, but exerted authoritarian control over them.  His fraudulent conduct was the result of pure greed that eventually placed the lives of numerous pilots and firefighters in extreme danger.

GOVERNMENT'S SENTENCING MEMORANDUM                                      PAGE 39

He schemed with Levi Phillips to create a formula that would allow them to deceive the FS into believing Carson's helicopters were actually weighed as required. Not satisfied with limiting it to just the two helicopters, he used the formula to create other false weights for other helicopters as well as generating a false weighing strictly on his own of a helicopter located in another country. Still not satisfied, Metheny created a falsified power performance chart to be used in conjunction with the false helicopter weights in order to achieve the minimum contract specifications for a much more lucrative contract. The FS had warned Metheny earlier about not using such a chart. The FS prohibited him from using the OEI 2 ½ Minute Power Available performance charts for bidding or field operations because it was intended for emergency operations only. Its use not only compromised safety, but gave them an unfair competitive advantage over other operators. A competitive advantage Metheny planned to capitalize on. The FS would have rejected the entire contract proposals he submitted if they had known of the falsified documents, rather than awarding Carson the lucrative helicopter contracts they received.

Metheny then made sure the falsified weight documents were in the helicopter flight manuals when the helicopters were inspected by the FS. He did this personally and caused others to do it for him. Dreadfully, he knew that they were to be used in conducting FS flight operations, often under dangerous conditions.

Besides discovering Metheny with the "suspicious" chart labeled "RFMS #5" (OEI 2 ½ Minute Power Available performance chart) that he submitted in the contract bid proposals, Carson's Chief Pilot (Harris) would discover much later that Metheny had other falsified performance charts that were labeled RFMS #8 and #9. Eventually, Metheny instructed Harris to

GOVERNMENT'S SENTENCING MEMORANDUM                                    PAGE 40

distribute the falsified RFMS #8 and #9 to pilots and helicopters where they were ultimately used to meet required payload calculations and for flight operations.

On August 5, 2008, N612AZ crashed during takeoff while conducting firefighting operations.  The crash resulted in 9 fatalities and 4 were severely injured.  The pilots utilized the falsified RFMS #8 Power Available chart and falsified weight documents from the flight manual in determining the payload calculations for the flight.

The falsified weight documents were those Metheny sent to the FS in the bid proposal and to Carson's facility in Perkasie, PA when N612AZ was inspected by the FS.  The falsified Power Available Chart was sent to N612AZ pilots when they were unable to meet contract payload specifications and were confused about which performance charts they were to use.  The pilot-in-command (Schwanenberg) called Metheny about the problem.  The following morning, the pilots received the falsified RFMS #8 Power Available chart in an email from Grants Pass. The pilots were then able to meet contract payload specifications.

The NTSB investigation determined that N612AZ was actually 1,437 lbs. heavier than the weight used by the pilots in calculating the allowable payload.  The weight they used was based on the false weight that Metheny created using Phillips' formula.  Also, using a legitimate RFMS #8 5-Minute Power Available chart the NTSB investigation determined the weight N612AZ could safely hover.  The result was the aircraft was 1,458 lbs. over the weight to safely hover and, accordingly, over the maximum allowable payload for safely carrying the firefighters. The N612AZ co-pilot said that a pilot has to trust the integrity of the charts with their life; if the weight of the helicopter is wrong, the final payload will be wrong.  If he had known, he would

GOVERNMENT'S SENTENCING MEMORANDUM                                    PAGE 41

never have used those charts.  Similarly, other pilots stressed the importance of using accurate charts as an integral part to the safe operation of a helicopter, especially when carrying passengers.  Also, if the FS Flight Leader at the crash site had known the truth about the aircraft's actual weight, he would have halted the operation and not have allowed the firefighters on N612AZ until the weight issue was resolved.

Metheny demonstrated such an indifference to the danger in which he placed others just to perpetuate the fraud.  He knew the falsified charts put firefighters and pilots at risk of serious injury.  He is a licensed helicopter pilot himself.  Moreover, within days he had the crash helicopter replaced with N410GH by using falsified power charts and weight documents.  Later, Metheny stonewalled the NTSB investigation.  He and Phillips were Carson representatives on the NTSB investigation.  Yet, Metheny knew NTSB investigators were relying on the falsified weight documents used by the crash helicopter and attempted to convince them of their accuracy.  He tried to perpetuate the fallacy by further concealing the fraud as well as obstructing the investigation into the cause of the crash.  In doing so, he utilized others to help him.  When NTSB discovered that the power available chart used by N612AZ was falsified, the product of a "cut and paste" created at the Grants Pass office, Metheny even attempted to throw suspicion onto someone he held animosity toward.

Metheny and Phillips then attempted to conceal and further prolong the fraud by devising schemes to prevent the FS from discovering the true weight of each aircraft.  Their schemes included having Carson pilots and crew improperly remove equipment and helicopter components.  However, some refused and one crew chief explained that he was done lying about

GOVERNMENT'S SENTENCING MEMORANDUM                                    PAGE 42

the helicopter's weight.  The FS eventually discovered that all of the aircraft were over their bid weight, the weight documents submitted in the contract proposals were fraudulent with underreported weights and the helicopters were using falsified performance charts.  The FS contracts were terminated in their entirety.

The Exclusive Use Contracts guaranteed that the daily payment rate would be paid over the entire mandatory availability period regardless of whether flight services were actually rendered.  The total value of the exclusive use contracts including option years for just daily helicopter availability amounted to $51,699,000.  Metheny intended for Carson to receive those guaranteed daily payments for merely having helicopters available even though they failed to meet the required minimum contract specifications.  Consequently, the intended loss is $51,699,000.

Carson had already received $11,313,888.12 for the daily availability of those helicopters before their contracts were terminated.  Even giving Metheny credit against the amount of intended loss for both the daily availability and hourly flight services Carson provided, the result is still $32,867,109 of intended losses with a 22-level increase in the offense level.  Even with this increase in the offense level, the government's 188 month recommended sentence is still within the applicable advisory guideline range of 151-188 months.

Helicopter firefighting operations certainly have a high level of risk where failure can have catastrophic consequences, such as with the crash of N612AZ.  Yet, what is totally unacceptable is the substantial risk Metheny created by his fraudulent conduct, unnecessarily putting the lives of so many pilots and firefighters in harm's way.  Metheny's actions have had

such an adverse and lasting impact on so many people, both financially and emotionally.  To

know that those firefighters would not have been allowed on the crash helicopter if the FS Flight

Leader or the pilots had known about the falsified weights is devastating to their families.

Moreover, the FS continues to rely heavily on private contractors to provide the necessary

helicopter services and firefighters who depend on safe helicopter transportation as they face

increasingly dangerous fire seasons ahead.  This is all the more reason for a sentence that will

provide adequate deterrence to similarly situated individuals from engaging in this type of illegal

activity when seeking government contracts to perform firefighting operations.

 Meanwhile, if Metheny's $170,000 yearly salary and bonuses were not enough, he was

stealing continuously from Carson.  He used Carson funds to buy jewelry and other personal

items for himself and his wife and to renovate their residence and sold Carson helicopter parts

and equipment and diverted the proceeds for his own use.  Moreover, he stole tail rotor blades

from a shipment at Carson's facility then attempted again to place suspicion on the same person

he had animosity toward revealing his self-centered and vindictive nature.

 Not only is the recommended 188-month sentence for the offense within the applicable

guideline range, though high it may be, it is certainly not extreme and is well warranted in light

of the facts of this case.  This sentence is particularly justified when considering the magnitude

of the fraudulent conduct and intended loss, the effort and manner used to conceal it, the

indifference to the safety of those performing helicopter firefighting operations, impeding the

NTSB investigation into the cause of the helicopter crash and the large number of people he

actually put in danger.  Accordingly, this sentence reflects the gravity and seriousness of the

GOVERNMENT'S SENTENCING MEMORANDUM       PAGE 44

offense, promotes respect for the law, and provides just punishment.  It will not only deter the defendant from engaging in future criminal conduct, but will likely deter similarly situated individuals from engaging in this type of illegal activity.

Further, pursuant to the plea agreement in this case, the government will move for the dismissal of the remaining counts as applied to and against Metheny, Counts 2 through 7 and Counts 9 through 23.

Dated this 20th day of March, 2015.

Respectfully submitted,

S. AMANDA MARSHALL
United States Attorney

*/s/ Byron Chatfield*
BYRON CHATFIELD
Assistant United States Attorney

GOVERNMENT'S SENTENCING MEMORANDUM                    PAGE 45